ELLER, Appellant,

v.

WENDY'S INTERNATIONAL, INC., Appellee.

[Cite as *Eller v. Wendy's Internatl., Inc.* (2000), 142 Ohio App.3d 321.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 99AP–1273.

Sept. 29, 2000.

324

*Michael Garth Moore,* for appellant.

*Mazanec, Raskin & Ryder Co., L.P.A.,* and *Edwin J. Hollern,* for appellee.

PETREE, Judge.

Plaintiff, Audrey Eller, appeals from a judgment of the Franklin County Court of Common Pleas in favor of defendant, Wendy's International, Inc. On appeal, plaintiff advances six assignments of error for this court's review:

"[1] The trial court erred in not granting a motion for a mistrial after counsel for defendant-appellee had injected improper references to Mrs. Eller's past and pending litigation in his opening statement and in examination of Mrs. Eller.

"[2] The trial court erred in allowing counsel for defendant-appellant [*sic*] to examine Dr. Murphy on the alleged claim that [Mrs. Eller] suffers from 'compensation neurosis.'

"[3] The trial court erred in excluding the testimony of Gerald Burko.

"[4] The trial judge's conduct elicited passion and prejudice against Mrs. Eller among the jurors.

"[5] The trial court erred in refusing to charge the jury on the issue of future impaired earning capacity.

"[6] The trial court erred in submitting to the jury the issue of comparative negligence."

In November 1996, plaintiff, a California resident, was in Columbus attending to personal business. While in Columbus, plaintiff stayed at the home of her

seven-year-old grandson, David, and his mother, plaintiff's former daughter-in-law, Diane Caplinger. At approximately 12:30 p.m. on November 24, 1996, plaintiff, David, and Caplinger entered the Wendy's restaurant located at 1920 Stringtown Road in Grove City. Because the restaurant was somewhat crowded, plaintiff and David sat at a table while Caplinger waited in line to order lunch. While waiting for the food to arrive, plaintiff decided to take David to get some napkins. As plaintiff and David walked toward the condiment stand, plaintiff stepped from a carpeted area of the floor onto a portion of the floor covered by ceramic tile. After walking approximately two or three steps on the tiled area, plaintiff slipped and fell on her right knee. Immediately after she fell, plaintiff felt discomfort in her right knee. Caplinger saw plaintiff fall and walked over to assist her. Another customer and one of defendant's employees, John Wilson, helped plaintiff to her feet.

Plaintiff testified that she did not observe any foreign substance (water, grease, soda, food, etc.) on the tiled area prior to her fall. Plaintiff further testified that she did not notice anyone mopping the floor prior to the fall, nor did she see any "caution" signs indicating that the floor was wet or otherwise hazardous. Plaintiff further testified that she had "no idea" how she fell, but described the fall as "just like hitting a skating rink. It was just very, very slippery. There was something very slippery that made me fall."

A few minutes after the fall, plaintiff noticed Wilson and another of defendant's employees looking, alternately, from her to the area of the floor where she had fallen. After a short discussion, the two men walked away and disappeared through a door in the back of the restaurant. Plaintiff and David then sat down at the table and waited for Caplinger to return with the food. A few minutes later, Wilson approached plaintiff's table and asked whether she was all right. He told plaintiff that a little boy had also fallen in the same area, but did not indicate whether the fall had occurred on the same day. No employee other than Wilson spoke to plaintiff that day. Plaintiff testified that she did not seek out a manager to report the incident because she knew that Wilson was aware of what had happened.

After finishing lunch, plaintiff, David, and Caplinger returned to Caplinger's home. Plaintiff testified that, for the next few days, her knee was swollen and painful; however, she did not contact defendant to report the incident. Five days after the fall, she returned to her home in California. Over the next few weeks, her knee continued to hurt. Believing that defendant should be responsible for paying for a medical consultation with regard to her injured knee, plaintiff called the Stringtown Road restaurant on December 21, 1996, identified herself, said she had fallen in the restaurant on November 24, 1996, and asked permission to send the bill to defendant. According to plaintiff, the manager with whom

plaintiff spoke, Scott Hood, told plaintiff that "[w]e must have been washing the floor. The cones were up. We have no liability." When she asked him what he meant by the word "cones," he hung up.

Having not received a satisfactory response from Hood, plaintiff called defendant's corporate headquarters on December 31, 1996, and spoke to a claims representative. Plaintiff again explained her situation and requested that defendant pay for a medical consultation. The claims representative told plaintiff that she would hear from someone within ten days. Before the expiration of the ten-day period, however, plaintiff decided that she could not wait any longer to see a physician. Accordingly, she made an appointment with an orthopedic specialist. According to plaintiff, no one representing defendant ever called her back.

Plaintiff's initial consultation with the orthopedic specialist, Dr. David G. Smith, was on January 13, 1997. Dr. Smith ordered an MRI and prescribed pain medication and physical therapy. Plaintiff continued the pain medication and physical therapy until May 1997, at which time she underwent arthroscopic surgery on her right knee. Due to complications from the surgery, she was hospitalized in June 1997. After her release from the hospital, she again underwent physical therapy. On July 27, 1997, her knee buckled as she walked into her kitchen. She fell to the floor, hitting both knees and left shoulder. As a result of the fall, plaintiff suffered a rotator cuff tear of her left shoulder.

Caplinger testified that she observed plaintiff slip and fall down on her knee as plaintiff walked across the tiled portion of defendant's dining room floor. She further testified that she did not notice anything visible on the floor that would have caused plaintiff to believe that the floor might be slippery. In an effort to determine what precipitated plaintiff's fall, Caplinger touched the floor with her fingers a few inches to the right of where plaintiff had fallen. Caplinger described the floor as feeling "slimy" and "greasy," "like if you fry something on the stove and you clean it up, and you wipe it down, and you wipe your fingers on it, you can feel the grease on it." She further testified that a large area of the floor was in this condition. Caplinger also stated that she noticed a "skid mark" in the area where plaintiff had fallen, "[l]ike a tennis shoe dragged through it." After plaintiff got to her feet, Caplinger helped her walk to the table. Shortly thereafter, Wilson approached the table and asked if plaintiff was all right. Caplinger told Wilson that the floor was slippery. Wilson told the two women that someone else had fallen there; however, he did not indicate whether the fall to which he referred had occurred the same day.

Scott Hood was the manager of the Stringtown Road restaurant on November 24, 1996. Hood testified that, as manager of the restaurant, he received training in the maintenance of the restaurant premises. As part of his management training, he received a copy of defendant's "Operational Procedures Manual"

("procedures manual") and a videotape on proper floor cleaning. As manager of the restaurant, Hood is responsible for training employees in proper floor-cleaning procedures. Hood further testified that a manager is supposed to walk through the dining room every fifteen minutes to ensure that the restaurant is free from potential hazards.

Hood further testified that, according to defendant's floor–cleaning procedures, any employee who observes a foreign substance on the floor is permitted to clean it up—whether the employee sweeps or mops the substance is left to the discretion of that employee. Hood acknowledged that substances such as water, oil, or grease tracked in from outside on customers' shoes would typically be caught on the carpeted area inside the entrance to the restaurant and, if not caught, would be visible on the floor.

Hood testified that the floor-cleaning instructions outlined in the procedures manual require the positioning of "Caution: Wet Floor" signs in the event the tile in the dining room is "dry-mopped" during business hours. Hood further acknowledged that the instructions regarding the posting of the "Caution: Wet Floor" signs are outlined in red in the manual, indicating that such procedures must be followed strictly in order to minimize the risk of someone being injured.

Hood explained that spills occurring during business hours are "dry-mopped," a procedure involving dipping the mop into a bucket of clean water, wringing the mop out until it is almost dry, then using the "dry" mop to clean the floor. No grease-cutting agent is used as part of the "dry-mopping" procedure. Hood acknowledged that if oil spilled on the floor was not "dry-mopped" properly, some of the oil might be left on the floor after the spill, which, in turn, could leave a slippery surface; however, he testified that he had never encountered such a situation during his tenure as manager of the restaurant.

Hood further testified that the December 21, 1996 telephone conversation with plaintiff was his first notification that she had fallen in the restaurant. He further testified that he remembered telling her that the "cones" were up. Finally, Hood admitted that he did not report the telephone call to either his supervisor or defendant's customer injury "hot line."

John Wilson testified that he worked as the dining room attendant in the Stringtown Road restaurant on November 24, 1996. Wilson testified that after another employee mopped up a soft drink spill from the tiled area of the floor, he went to retrieve a "wet floor" sign. When he returned with the sign, he noticed a dark-haired Korean woman "down on the floor" in the area that had just been mopped. He asked the woman if she was all right. Thereafter, Wilson told his manager that the woman had slipped and fallen. The manager told Wilson that he would handle the situation. Wilson did not specify as to when the incident he

described had occurred; however, he indicated that he had seen only one woman fall at the Stringtown Road restaurant in the time he worked there.

Videotaped depositions of Dr. Paul C. Murphy, plaintiff's orthopedic surgeon, and Robert Quintas, plaintiff's physical therapist, were played for the jury, wherein both testified as to the medical treatment rendered plaintiff subsequent to November 24, 1996. In short, each of these medical professionals opined on direct examination that the medical treatment rendered plaintiff was directly attributable to a traumatic injury to her knee such as that suffered by plaintiff in her November 24, 1996 fall in defendant's restaurant. On cross-examination, both admitted, however, that their opinions were based solely on information received from plaintiff regarding that fall.

The parties stipulated that plaintiff incurred reasonable and necessary medical expenses in the treatment of her right knee and left shoulder totaling $41,372.81. The stipulation did not, however, include an admission by defendant that the medical expenses incurred were proximately caused by plaintiff's fall on defendant's premises.

At the conclusion of trial, the jury returned a verdict for defendant, answering "No" to Interrogatory No. 1: "Do you find from the greater weight of the evidence that Plaintiff's injury was caused by an unsafe condition that existed on Defendant Wendy's International, Inc.'s premises?" The trial court's judgment entry incorporating the jury's verdict and awarding judgment in favor of defendant was filed September 1, 1999.

Plaintiff filed a motion for new trial pursuant to Civ.R. 59 on September 13, 1999. The trial court overruled the motion by entry dated October 13, 1999. Plaintiff filed her timely notice of appeal on November 9, 1999.

By her first assignment of error, plaintiff contends that the trial court erred in failing to grant a mistrial after defense counsel improperly referenced plaintiff's past and pending litigation during opening statement and on cross-examination of plaintiff.

Prior to trial, plaintiff filed a motion *in limine* seeking exclusion of, *inter alia*, any reference to prior injuries sustained by plaintiff in a slip-and-fall incident that occurred in 1989. Plaintiff asserted that evidence of plaintiff's prior injuries could only be introduced if expert testimony causally connected the prior injuries with those in the instant action. Plaintiff further sought to preclude any reference to a lawsuit plaintiff filed as a result of the prior slip-and-fall incident. Plaintiff sought exclusion of the litigation evidence under Evid.R. 404(B).

Defendant filed a memorandum in opposition, arguing that evidence of plaintiff's prior injuries that could be causally connected to her current claims was relevant under Evid.R. 401 and should not be excluded. Defendant further

argued that Evid.R. 404(B) was not controlling because defendant intended to introduce evidence of plaintiff's prior injuries "solely for the purposes of establishing a causal connection to Plaintiffs' claims in the current matter, and not for the purpose of impugning Mrs. Eller's character." Defendant, however, did not specifically address the issue of the prior litigation.

By written decision, the trial court found, pursuant to Evid.R. 401, that evidence demonstrating that plaintiff sustained prior injuries similar to those alleged in the instant action was relevant. Accordingly, the trial court found plaintiff's argument seeking preclusion of all evidence relating to any previous injuries or claims to be premature. Noting that both parties generally agreed that evidence of plaintiff's previous knee injury was relevant, the trial court determined that evidence of any additional prior injuries or claims would have to be evaluated at the time of trial to determine relevancy. Accordingly, the court found that it would be improper to rule unconditionally that no evidence of plaintiff's previous injuries or claims should be admitted when the court had not had the opportunity to evaluate the evidence.

During opening statement, plaintiff's counsel referred to the procedures outlined in defendant's procedures manual regarding the reporting of customer injuries and, specifically, to the fact that despite being aware of plaintiff's fall, no one employed by defendant followed the procedures as outlined, *i.e.*, filled out an accident claim report or made plaintiff aware that she could initiate a claim. Counsel also averred several times that plaintiff called defendant asking permission to seek medical attention and to send the bill for any medical services rendered to defendant.

In his opening statement, defense counsel referred to the fact that plaintiff did not schedule an appointment with a physician until January 13, 1997, some six weeks after the fall in defendant's restaurant. Immediately thereafter, defense counsel averred that "she [plaintiff] is not a stranger to litigation." Plaintiff's counsel immediately objected and asked to approach the bench. The court called a sidebar, at which time plaintiff's counsel argued that the court's prior ruling on plaintiff's motion *in limine* proscribed any reference to plaintiff's prior litigation history, as such evidence was irrelevant. Plaintiff's counsel maintained that defense counsel's statement was prejudicial and requested that the court instruct the jury to disregard defense counsel's last comment and instruct defense counsel not to refer to the 1989 litigation.

In response, defense counsel argued that the court had previously ruled that evidence of the prior lawsuit was relevant to the instant action because plaintiff's claim that she injured her right knee in the instant action was the identical claim that she had made in the previous lawsuit. Plaintiff's counsel argued that the trial court ruled only that medical evidence of plaintiff's prior injury was

admissible, not her litigation history. Plaintiff's counsel further argued that the only reason for informing the jury of the previous lawsuit was to demonstrate that plaintiff was a "compulsive litigator." Plaintiff's counsel thereafter requested that the court declare a mistrial.

After further discussion between the court and counsel for both parties, the court indicated that it did not remember considering or ruling on the issue in the motion *in limine*. Thereafter, defense counsel offered a general explanation of the prior case, stating "she fell down in '89. She sued in '90, same complaint. She argued in 1991. She got an award. She settled the case. That is exactly the same thing she has done here. She waited two months after she had treatment."

Plaintiff's counsel argued that defense counsel's statement about the 1989 litigation inferred that plaintiff's case was fraudulent and that there was no evidence to support such an inference. In response, defense counsel then cited Evid.R. 405 and argued that proof of specific instances of plaintiff's conduct, *i.e.*, filing the previous lawsuit, could be made in cases in which character or a trait of character is an essential element of a defense. In arguing Evid.R. 405, defense counsel stated that "her [plaintiff's] character is to file this lawsuit. She is a litigious person."

After this colloquy, the trial court informed the jury that the court was going to recess for the evening in order for counsel and the court to discuss a statement made by defense counsel in opening statement. Thereafter, the court instructed the jury that statements made by counsel in opening statement do not constitute evidence.

After conferring the next morning in chambers with counsel for both parties, the trial court acknowledged that courts generally find reference to an opposing party's previous litigation history to be more prejudicial than probative; however, the court overruled plaintiff's objection to defense counsel's reference to plaintiff's prior lawsuit. The court, referring to plaintiff's counsel's opening statement, stated:

"I got it from the tenure [*sic*] was that * * * Ms. Eller didn't talk to Wendy's because she was not sure she hurt this knee * * * five days later she did call and they hung up the phone on her. She just was lost about what to do with this injury that she had. In opening statement there was a picture that she was pretty much put upon by Wendy's and didn't really know what to do.

" * * *

"She had had the knee injured and did go to the doctor. She did file a lawsuit and so she had previous experience with the situation."

Plaintiff's counsel suggested that if the court's concern was with plaintiff's knowledge or lack thereof as to how to report an incident to a premises owner, the defense could question her about having filed an accident report after the 1989 incident—which she had done—a course which would have eliminated the implication of litigation. The court rejected plaintiff's counsel's suggestion. The court then ruled that defense counsel had the right to cross-examine plaintiff about her previous knee injury and the resultant litigation.

Plaintiff's counsel objected to the trial court's ruling on the basis that any reference to the previous litigation was prejudicial because it might mislead the jury into believing that the plaintiff was a litigious person. Plaintiff's counsel also requested that the court issue a limiting instruction. The court denied the request on the basis that the comment was made in opening statement and, as such, did not constitute evidence. The court then informed plaintiff's counsel that he was free to object to any statements made by defense counsel in opening statement and that, if necessary, the court would caution the jury at the appropriate time.

Subsequent to the trial court's ruling, defense counsel resumed his opening statement, during which he referenced plaintiff's 1989 slip and fall, the injury to her right knee and shoulder, the lawsuit she filed, and the settlement she received. As part of his opening statement, defense counsel maintained that, based on plaintiff's prior litigation experience, she was well aware in 1996 of both the procedure for informing defendant of her injury and of obtaining a physician.

On direct examination, plaintiff's counsel questioned plaintiff about the 1989 slip-and-fall incident. In that regard, plaintiff testified that she had tripped on a sidewalk near her home in California and had fallen on her knees and right shoulder. Seven or eight weeks later, plaintiff sought medical attention for her injuries. Examination of her knees revealed no injury; however, she received medical treatment and underwent physical therapy on her right shoulder. On cross-examination, defense counsel alluded to plaintiff's previous lawsuit by inquiring as to whether she received treatment for her shoulder injury after she resolved her claim against the defendant in that case.

As noted previously, plaintiff argues on appeal that the trial court erred in failing to grant plaintiff's request for a mistrial after defense counsel's references to plaintiff's prior litigation history in opening statement and on cross-examination of plaintiff. More specifically, plaintiff argues that the trial court failed to conduct the requisite analysis under Evid.R. 404(B), *i.e.*, failed to weigh the probative value of the evidence regarding plaintiff's prior litigation history against the danger that plaintiff would be prejudiced by the admission of such evidence.

Defendant argues that plaintiff's counsel opened the door to defense counsel's references to the 1989 injury and litigation by repeatedly inferring in opening statement that plaintiff did not understand that she could have scheduled an appointment with a physician without seeking permission to do so from defendant. Defendant argues that plaintiff's counsel's comments suggested that plaintiff's naiveté compelled her to look to defendant for guidance as to how to proceed after the incident, including whether or not to seek medical treatment, and that defendant somehow shirked its corporate responsibility to plaintiff by failing to handle plaintiff's claim properly. Defendant maintains that the "not a stranger to litigation" comment was made only to counter plaintiff's counsel's statements and was in no way meant to assail plaintiff's character.

Upon review of the record, we agree with plaintiff that defense counsel's references to plaintiff's prior litigation history were indeed intended as an attack upon plaintiff's character. Although defendant now argues that the remark in opening statement was made only to counter the inference that plaintiff was unsophisticated in methods of reporting hazardous conditions to premises owners, defense counsel argued before the trial court that the comment was proper under Evid.R. 405 (which permits proof of specific instances of conduct to cases in which character or a trait of character is an essential element of a defense) and that plaintiff's character was that of a litigious person.

As noted by the court in *Outley v. New York* (C.A.2, 1988), 837 F.2d 587, 592:

■ "The charge of litigiousness is a serious one, likely to result in undue prejudice against the party charged, unless the previous claims made by the party are shown [not] to have been fraudulent. * * * As we said in *Raysor v. Port Authority*, 768 F.2d 34, 40 (2d Cir.1985), cert. denied, 475 U.S. 1027, 106 S.Ct. 1227, 89 L.Ed.2d 337 (1986), '[a plaintiff's] litigiousness may have some slight probative value, but that value is outweighed by the substantial danger of jury bias against the chronic litigant. The trial court has a duty to prevent exploitation of this prejudice * * *.' (Citation omitted.) Although *Raysor* dealt with questions asked of a *pro se* litigant, the serious impact of a charge of litigiousness, and the responsibility of the trial judge to guard against it, remain the same when the accusation is made in an opening statement or when the party is represented by counsel * * *, particularly since counsel's objection to the statement was overruled. * * * "

Otherwise relevant evidence must be excluded under Evid.R. 403(A) if "its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Also relevant is Evid.R. 404(B), which provides:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

Had the trial court conducted the requisite analysis under Evid.R. 403(A) and 404(B), this court would have no choice but to affirm the trial court's decision absent an abuse of discretion. A trial court is vested with broad discretion when considering the admission or exclusion of evidence. *State v. Allen* (1995), 73 Ohio St.3d 626, 633, 653 N.E.2d 675, 683. In the absence of such an analysis by the trial court, however, this court must determine whether the statements made by defense counsel during opening statement and upon cross-examination warrant reversal of the judgment in favor of defendant. As such, we must examine the particulars of the entire trial and the likelihood that plaintiff suffered genuine prejudice from defense counsel's comments. Upon such an examination, we find that plaintiff was not unduly prejudiced thereby.

Initially, we note that the trial court repeatedly cautioned the jurors that opening statements do not constitute evidence. A jury is presumed to follow a trial court's instructions. *Pang v. Minch* (1990), 53 Ohio St.3d 186, 559 N.E.2d 1313, paragraph four of the syllabus. Moreover, we do not believe that a reasonable juror would find plaintiff to be a chronic litigant solely because she filed a prior lawsuit for a different injury ten years ago.

Furthermore, upon an assessment of the entirety of the evidence presented in this case, coupled with the jury's response to Interrogatory No. 1, we find it highly unlikely that plaintiff suffered undue prejudice as a result of defense counsel's remarks.

To demonstrate "actionable negligence," plaintiff was required to establish the existence of a duty of care, a breach of that duty, and injury proximately resulting from such breach. *Chalfant v. P.W. Motel Mgt.* (Mar. 30, 2000), Franklin App. No. 99AP–886, unreported, 2000 WL 329169, at * 2. With respect to the duty of care owed plaintiff by defendant, we note that it is undisputed that plaintiff was a "business invitee," *i.e.,* " ' "one rightfully on the premises of another for purposes in which the possessor of the premises had a beneficial interest." ' " *Id.,* quoting *Bowins v. Euclid Gen. Hosp. Assn.* (1984), 20 Ohio App.3d 29, 30, 20 OBR 31, 32, 484 N.E.2d 203, 204.

Generally, a business owner owes business invitees a duty of ordinary care in maintaining the premises in a reasonably safe condition so that such invitees are not unnecessarily and unreasonably exposed to danger. *Paschal v. Rite Aid Pharmacy, Inc.* (1985), 18 Ohio St.3d 203, 203, 18 OBR 267, 267, 480

N.E.2d 474, 475. A business owner is not, however, an insurer of an invitees' safety. *Id.*

In *Guilford v. Cent. Hardware Co.* (1989), 62 Ohio App.3d 58, 60, 574 N.E.2d 564, 566, this court noted the distinction between hazardous conditions created by the business owner and those created by the acts of third parties. Where a plaintiff's injury is due to a hazardous condition not created by the business owner, the plaintiff is required to demonstrate that the owner had, or in the exercise of ordinary care should have had, notice of the hazard for a sufficient time to enable the owner to remove it or warn customers about it. *Presley v. Norwood* (1973), 36 Ohio St.2d 29, 31, 65 O.O.2d 129, 130, 303 N.E.2d 81, 83. To support an inference that a business owner had constructive notice of a hazardous condition, there must be evidence of the length of time the hazard existed. *Id.* at 32, 65 O.O.2d at 130, 303 N.E.2d at 84. In contrast, when an owner creates the hazardous condition, a plaintiff is not required to demonstrate specifically that the owner had knowledge or notice of such hazard. *Dent v. Gen. Mills Restaurants, Inc.* (Sept. 16, 1997), Franklin App. No. 97APE05–606, unreported, 1997 WL 578945, at * 2. As noted previously, a business owner owes business invitees a duty of ordinary care in maintaining the premises in a reasonably safe condition. In general, reasonable care includes the duty to warn patrons of a dangerous condition known to the owner. *Jackson v. Kings Island* (1979), 58 Ohio St.2d 357, 359, 12 O.O.3d 321, 322, 390 N.E.2d 810, 812.

Plaintiff's theory of the case was that defendant improperly "dry-mopped" an alleged spill that occurred immediately preceding plaintiff's fall and that such act caused an invisible film of oil to be spread over a wide area of the floor, including the spot where plaintiff fell. Plaintiff further maintained that defendant was negligent in failing to warn plaintiff (and other patrons) of this known latent hazardous condition. In support of this theory, plaintiff relies upon (1) plaintiff's and Caplinger's testimony that although there was no visible foreign substance on the floor prior to plaintiff's fall, the floor was very slippery; (2) Wilson's testimony that a spill had occurred and another patron had fallen in the same area; (3) Caplinger's testimony that the floor felt greasy to the touch; (4) Hood's testimony that any substances tracked in from the outside would have been either caught on the carpet or visible to plaintiff as she walked across the floor; and (5) the December 21, 1996 telephone conversation between plaintiff and Hood, wherein Hood suggested that the floor had been washed and the "cones" were "up."

The mere fact that a customer slips and falls on the floor of a business establishment does not, standing alone, create an inference that the floor was unsafe. *J.C. Penny Co., Inc. v. Robison* (1934), 128 Ohio St. 626, 1 O.O. 299, 193 N.E. 401, paragraph four of the syllabus. Rather, there must be evidence

tending to show that some negligent act or omission of the business owner caused the fall. *Id.*

The jury, as trier of fact, was free to believe or disbelieve any of the witnesses who testified at trial, and was likewise free to accept or reject any of the inferences upon which plaintiff based her claim and/or plaintiff's entire theory of the case. As evidenced by the jury's response to Interrogatory No. 1, it is clear that the jury did not find the evidence upon which plaintiff relies sufficient to overcome her burden of proof on the issue of whether defendant created a hazardous condition on its premises. The jury's finding in this regard is supported by prior decisions of this court. See, *e.g., Colletti v. J.C. Penney Co., Inc.* (Mar. 9, 1993), Franklin App. No. 92AP–1605, unreported, 1993 WL 69438, and *Gon v. Dick Clark's Am. Bandstand & Grill* (Feb. 11, 1996), Franklin App. No. 96APE07–910, unreported, 1996 WL 785533.

Given all the foregoing, we find that although the trial court should have conducted an analysis under Evid.R. 403(A) and 404(B) with regard to defense counsel's references to plaintiff's prior litigation history, any error in failing to do so was harmless. As such, the trial court did not abuse its discretion in refusing to grant plaintiff's motion for mistrial. The decision whether to grant a mistrial is one addressed to the sound discretion of the trial court. *Quellos v. Quellos* (1994), 96 Ohio App.3d 31, 41, 643 N.E.2d 1173, 1180. This court may not substitute its judgment for that of the trial court absent an abuse of discretion. *Id.* Accordingly, the first assignment of error is overruled.

By the second assignment of error, plaintiff contends that the trial court erred in allowing defense counsel to examine Dr. Murphy on the alleged claim that plaintiff suffers from a condition known as "compensation neurosis."

On cross-examination, defense counsel asked Dr. Murphy if he had ever treated a patient suffering from "compensation neurosis." Plaintiff's counsel objected to the line of questioning on two bases: (1) that no defense witness was scheduled to testify on the issue and (2) that Dr. Murphy had already testified that he was not an expert in the field of psychology and psychiatry. The trial court overruled the objection. In response to defense counsel's question, Dr. Murphy stated that he was unfamiliar with the term "compensation neurosis." Defense counsel thereafter defined the term: "[I]t's certain patients involved in litigation [who] are driven by the potential monetary reward rather than a good physical outcome." Dr. Murphy admitted that he had not consulted with plaintiff's treating psychologist to determine whether she might have "compensation neurosis" or some other psychological component to her medical condition. However, he opined that plaintiff did not suffer from "compensation neurosis," as legitimate objective findings supported the medical diagnoses regarding her knee and shoulder injuries.

In reviewing plaintiff's argument, we are mindful that "[t]he scope of cross-examination and the admissibility of evidence during cross-examination are matters that rest in the sound discretion of the trial judge." *O'Brien v. Angley* (1980), 63 Ohio St.2d 159, 163, 17 O.O.3d 98, 100, 407 N.E.2d 490, 493. Thus, absent a showing of a clear and prejudicial abuse of discretion, the trial court's decision will not be disturbed on appeal. *Id.* An abuse of discretion requires a demonstration that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Cedar Bay Constr., Inc. v. Fremont* (1990), 50 Ohio St.3d 19, 22, 552 N.E.2d 202, 205.

Assuming, *arguendo,* that the trial court should not have allowed the challenged testimony, any error in its admission was harmless. Once defense counsel defined the term "compensation neurosis," Dr. Murphy opined that plaintiff did not suffer from such a condition, as legitimate objective findings supported the medical diagnoses regarding plaintiff's knee and shoulder injuries. Under these circumstances, we fail to see in what manner plaintiff's case was prejudiced by the introduction of evidence that was wholly rejected by Dr. Murphy. Accordingly, plaintiff's second assignment of error is overruled.

By the third assignment of error, plaintiff challenges the trial court's ruling excluding the testimony of defendant's expert witness. Prior to trial, defendant filed a motion *in limine* seeking to exclude the testimony of plaintiff's expert witness, Gerald S. Burko, on the basis that Burko's testimony was irrelevant and did not relate to matters beyond the knowledge or experience possessed by lay persons as required by Evid.R. 702. Plaintiff filed a memorandum in opposition.

Pursuant to Evid.R. 104(A), the trial court held a hearing on the matter immediately preceding trial. At that hearing, Burko, a safety engineer consultant, testified on direct examination that he was familiar with the general properties, including the potential for slipperiness, of the type of industrial ceramic tile utilized in retail and industrial establishments such as defendant's restaurant. Burko further stated that ceramic tile such as that used in defendant's restaurant absorbs a portion of any substance dropped on it, including oil and grease. He further testified that he was familiar with laboratory tests designed to determine the coefficient of friction ("COF") of ceramic tile. He opined that the average person was not aware of either the changes that may occur to ceramic tile properties over time, including their COF and/or absorption rates.

Burko admitted that he had not conducted a COF test on the ceramic tile in defendant's restaurant; however, he stated that there would have been no value to conducting such a test as the COF changes with time and with changed conditions. He further testified that in forming an opinion on the cause of a

premises fall, he typically looks at evidence, such as statements regarding site conditions, and does not necessarily need to inspect the site himself in order to form an opinion.

Based on a hypothetical posited by plaintiff's counsel, *i.e.*, that the ceramic tile in defendant's restaurant (1) was general industrial nonglazed ceramic quarry tile, (2) had been in place for seven to twenty years, (3) was located in a high-traffic area, (4) was subjected to spills of water, oil, and grease over the years, and (5) had been cleaned according to the procedures outlined in defendant's operational manual, Dr. Burko opined that there was a reasonable probability that the tile had absorbed a substantial amount of oil and grease over the years and that the cleaning procedures utilized by defendant did not remove all that had been absorbed.

Burko opined that, based upon his review of both plaintiff's and Caplinger's description of the floor on the day of plaintiff's fall and the cleaning procedures set forth in defendant's operational procedures manual, the most probable cause of the slippery condition of the floor was that a mop used to clean a spill had grease or oil on it from a previous dry-mopping and the oil or grease residue on the mop was then spread over a wide area of the floor. Burko opined that defendant's use of plain water (dry-mopping) to clean an area that has grease or oil residue is not a safe procedure because it serves only to spread the oil or grease, as opposed to cleaning it up. According to Burko, the floor looks clean only because the oil or grease is spread in a very thin layer.

On cross-examination, Burko admitted that it is common knowledge that a greasy floor is generally more slippery than a dry floor. He further testified that he had never tested the COF of a piece of ceramic tile and is not qualified to do so. He also stated that he did not test an exemplar piece of tile used in defendant's restaurant, nor did he visit defendant's restaurant after plaintiff's fall, nor did he have any knowledge of the condition of the tile beyond that which plaintiff's counsel had told him. He further testified that he did not utilize any scientific testing method to determine how long it takes a floor to dry after being dry-mopped and/or to determine the effectiveness of the degreasing agent utilized by defendant in their cleaning procedures. Burko further testified that he utilized no scientific method in determining either that the tile was greasy or that defendant created a hazard by spreading grease during dry-mopping; rather, he based his conclusion on statements made by plaintiff and Caplinger that the floor felt greasy. Burko further testified that he based his conclusion on testimony and deductive reasoning, including eliminating other causes for plaintiff's fall.

By written decision dated August 24, 1999, the trial court found Burko's testimony to be in contravention of Evid.R. 702 and, therefore, not admissible.

Specifically, the trial court found that Burko had not visited the scene of plaintiff's accident, did not possess any knowledge of the substance that plaintiff alleged caused her fall, and had not performed scientific testing of any type. The trial court found that Burko's only source of information stemmed from his review of discovery materials and a meeting with plaintiff and Caplinger. Further, the court found as follows:

"During his testimony in front of this Court, Burko could not state whether the tile on which Plaintiff fell was glazed or unglazed, nor could he state the coefficient of friction (COF) which he previously indicated in his report was a revealing scientific calculation. Burko specifically testified that the COF was a test which had no substantial meaning in a field setting and would not be revealing even if it was taken immediately following a fall on ceramic tile. If this is the case, then it would appear to the Court that scientific testing or opinion on the COF of the floor would not be of any assistance to the jury. Burko further testified that his conclusions both on causation and on negligence were arrived at through deductive reasoning and the elimination of any other possibilities. This consisted of taking into account the statements made by both Plaintiff and Caplinger that: (1) the floor where the incident took place was not wet; (2) it did not appear that anything had been tracked in from outside; (3) there did not appear to be any items on the floor, including the products from the salad bar and those sold by Wendy's; (4) the area appeared slippery or slimy and (5) the slimy area appeared to cover a significant region thus indicating it may have been spread. While it is true that deductive reasoning is a tool of any scientist, the Court does not find that any scientific method or expert reasoning was necessary to engage in the analysis and process of elimination opinion rendered by Burko. In this respect the Court finds that Burko's testimony fails to satisfy Evid.R. 702(A)."

The court further found:

"Plaintiff in her Memorandum Contra states that a second purpose of Burko's expert testimony is to dispel a misconception common among lay persons. See Evid.R. 702(A). To this result, Plaintiff suggests that one such misconception where Burko is of assistance is the idea that a floor must be wet in order to be hazardous. However, during his testimony, Burko indicated that an ordinary person could distinguish that a floor is more slippery when wet than dry and that a lay person could further conclude that a floor is more slippery when greasy than when not. The Court is not in agreement with Plaintiff that Burko can enlighten the trier of fact with any degree of certainty beyond these rudimentary conclusions. As a result of the foregoing, Burko's testimony is not admissible because it is speculative and it fails to relate to matters beyond the knowledge or experience possessed by lay persons."

Evid.R. 702 provides in part that:

"A witness may testify as an expert if all of the following apply:

"(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

"(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

"(C) The witness' testimony is based on reliable scientific, technical, or other specialized information."

"The initial determination of whether a witness is qualified to testify as an expert and to give an opinion on a particular subject rests within the discretion of the trial court." *Joyce–Couch v. DeSilva* (1991), 77 Ohio App.3d 278, 284, 602 N.E.2d 286, 290. Accordingly, a trial court's ruling excluding an expert's testimony will not be reversed in the absence of an abuse of discretion. *Id.* See, also, *Fugett v. Harris* (1995), 107 Ohio App.3d 415, 419, 669 N.E.2d 6, 8. ("Whether an individual qualifies as an expert is a question for the court pursuant to Evid.R. 104[A], and will be reversed only for an abuse of discretion.").

Burko admitted that he had not visited the scene of plaintiff's accident, nor had he performed experiments on or even seen the type of tile used by defendant on which plaintiff claims to have slipped. He further admitted that he arrived at his opinions without the use of any type of specialized scientific knowledge and utilized only deductive reasoning and the elimination of other causes for plaintiff's fall in rendering his opinion. Upon review of the record, including the trial court's well-reasoned written decision, we find that the trial court did not abuse its discretion in excluding Burko's testimony. Accordingly, plaintiff's third assignment of error is overruled.

██ By the fourth assignment of error, plaintiff argues that the trial court acted in such a manner as to elicit passion and prejudice against her among the jurors. More specifically, plaintiff argues that the trial court violated Canon 3(B)(4) and (5)[1] of the Code of Judicial Conduct when the court "personally attacked * * * [plaintiff's counsel] without justification, in front of the jury and in the public courtroom." (Plaintiff's brief at 33.)

─────────

**1.** Canon 3 of the Code of Judicial Conduct is titled as follows: "A judge shall perform the duties of judicial office impartially and diligently." Canon 3(B)(4) provides: "A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity * * *." Canon 3(B)(5) provides: "A judge shall perform judicial duties without bias or prejudice. A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice * * *."

The unjustified personal attack to which plaintiff refers was made during the course of the sidebar discussion held pursuant to defense counsel's "not a stranger to litigation" comment:

"MR. MOORE [counsel for plaintiff]: I think, you Honor, we need to address this outside the presence of the jury.

"THE COURT: You are.

"MR. MOORE: We need to—

"THE COURT: Let's go. Come on. Listen, I'm going to run this court. This is about the third time you have told me how I'm going to do this or that. Let's do it. Okay."

"[A] trial judge is presumed not to be biased or prejudiced, and the party alleging bias or prejudice must set forth evidence to overcome the presumption of integrity." *Okocha v. Fehrenbacher* (1995), 101 Ohio App.3d 309, 322, 655 N.E.2d 744, 752, citing *State v. Wagner* (1992), 80 Ohio App.3d 88, 93, 608 N.E.2d 852, 856. "The existence of prejudice or bias against a party is a matter that is particularly within the knowledge and reflection of each individual judge and is difficult to question unless the judge specifically verbalizes personal bias or prejudice toward a party." *Okocha, supra,* citing *In re Adoption of Reams* (1989), 52 Ohio App.3d 52, 59, 557 N.E.2d 159, 166.

In support of her claim, plaintiff relies upon the affidavits of plaintiff's counsel's secretary and paralegal, both of whom attested that the comment made by the trial court was loud enough to have been heard by the jury. However, plaintiff's evidence is insufficient to demonstrate that the jury in fact even heard the trial court's statement, let alone was influenced by it. Further, "Evid.R. 611(A)[2] recognizes the trial court's authority to exercise control over the courtroom." *Nabakowski v. 5400 Corp.* (1986), 29 Ohio App.3d 82, 90, 29 OBR 92, 100, 503 N.E.2d 218, 226. We find that the trial court's statement herein was a reasonable exercise of that control.

Finally, we note that even if this court could conceivably rule that the trial court's statement demonstrated an unfair bias toward plaintiff, the record demonstrates that at the close of the trial, the trial court instructed the jury as follows:

"If, during the course of the trial, the Court said or did anything which you consider an indication of the Court's view on the facts, you are instructed to

---

2.  Evid.R. 611(A) provides:

"The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment."

disregard it. The Judge must be impartial, and I sincerely desire to be impartial presiding over this and every other trial before a jury or without one."

▆▆▆ "[N]o prejudice is shown to the complaining party absent some proof that the jury failed to follow the instruction of the court to disregard any perceived bias or prejudice of the judge." *Cordell v. Croak* (Aug. 1, 1997), Lucas App. No. L–96–141, unreported, 1997 WL 440901, at * 4. Plaintiff has not demonstrated that the jury failed to follow the court's instruction and has not shown that the trial court's conduct prejudiced her right to a fair trial. Accordingly, the fourth assignment of error is overruled.

By the fifth and sixth assignments of error, plaintiff contends that if this court remands the case for a new trial pursuant to a finding that prejudicial error was committed, the trial court should be directed to charge the jury on the issue of future impaired earning capacity and to refuse to charge the jury on the issue of comparative negligence. Having determined in the first through fourth assignments of error that no prejudicial error occurred warranting a new trial, the court finds that the fifth and sixth assignments of error are rendered moot.

Having overruled the first through fourth assignments of error and having found the fifth and sixth assignments moot, this court hereby affirms the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

TYACK and LAZARUS, JJ., concur.